(January 30, 2007)

■ MARTINEZ 2001 et al., Respondents, v NEW YORK CITY CAMPAIGN FINANCE BOARD, Appellant. [829 NYS2d 55]—

Order, Supreme Court, New York County (Paul G. Feinman, J.), entered August 12, 2005, which granted plaintiffs' motion for a preliminary injunction to the extent of restraining defendant New York City Campaign Finance Board (Board) from conducting any hearing regarding the alleged violations contained in the Board's notice and supplemental notice, and any further adjudication of the first, second and fourth through eleventh alleged violations, and denied defendant's cross motion to dismiss the action, unanimously reversed, on the law, without costs, the motion for injunctive relief denied and the cross motion to dismiss granted. The Clerk is directed to enter judgment in favor of defendant dismissing the complaint.

This action arose out of a postelection audit conducted by defendant New York City Campaign Finance Board regarding the campaign of plaintiff Miguel Martinez for election to the New York City Council in 2001. Martinez was elected to the City Council in 2001 to represent a district in the Washington Heights section of Manhattan. He was subsequently reelected in 2003 and 2005. Coplaintiff Martinez 2001 was Martinez's campaign committee in connection with his successful 2001 election.

The Campaign Finance Program is a voluntary program that was established in 1988 by the New York City Campaign Finance Act and the Campaign Finance Board Rules (*see* Administrative Code of City of NY § 3-701 *et seq.*; NY City Charter §§ 1051, 1052; 52 RCNY). It is administered by defendant New York City Campaign Finance Board (Board) and provides public matching funds to candidates running for the offices of mayor, comptroller, public advocate, borough president and city council member (*see New York City Campaign Fin. Bd. v Ortiz*, — AD3d —, 2006 NY Slip Op 09532, *2 [1st Dept 2006]). In order to receive public matching funds, a candidate must agree to abide by the program's detailed requirements, which include, inter alia, the filing of periodic financial disclosure statements reporting

contributions received by the candidate's committee and its expenditures; limitations on the total amount of money the committee can spend; restrictions on the amount that may be received from a single contributor; and an obligation to respond to requests for documentation and information from the Board to verify the committee's compliance with the program (*see id.* at —, 2006 NY Slip Op 09532 at *2-3; Administrative Code § 3-704; 52 RCNY 1-08 [g]). If a participant in the program cannot demonstrate with adequate documentation that the public funds received were spent on qualified campaign expenditures, the Board may require that the candidate's committee repay the money (*see* Administrative Code § 3-710 [2] [b]; *New York City Campaign Fin. Bd.* at —, 2006 NY Slip Op 09532 at *5-6).

Martinez joined the matching funds program for the 2001 election by submitting the certification form required by Administrative Code § 3-703 (1) (c) and 52 RCNY 2-01. Based on the financial disclosure statements that Martinez's committee filed with the Board, Martinez received $128,786 in public funds for his 2001 election campaign.

Following the 2001 election, the Board commenced a routine postelection audit of Martinez's campaign and requested documentation to substantiate the campaign's use of program funds (Administrative Code § 3-708 [5]; § 3-710 [1]). According to the Board, Martinez's committee refused to answer questions put to it, was generally uncooperative with the audit and failed to provide complete documentation. Accordingly, the Board issued a draft audit report on November 20, 2002 which set forth six findings detailing categories of documents or transactions for which corrective action was needed, and furnished recommendations for addressing each problem. The draft report further noted that the Martinez campaign had yet to document that any of the $128,786 in funds received was spent appropriately.

In March 2003, the committee provided additional documentation and information to the Board, which the latter again found unsatisfactory. Accordingly, on July 8, 2003, Board staff member Julius Peele issued a follow-up letter (Peele letter) requesting additional information and clarification from the committee. Specifically, the Peele letter requested additional documentation and/or explanations regarding five of the six findings originally raised in the draft report. In addition, the letter included a "new finding" concerning documentation of expenditures, citing five examples where specific documents provided by the committee bore indicia of fraud, such as apparently altered invoices, discrepancies in signatures in related documents, simi-

lar signatures in unrelated documents and double endorsements of checks. The letter concluded by stating that "the findings may be referred to the Board's legal unit" and that "[t]his is the committee's final opportunity to respond."

After a further exchange of documents, the Board served plaintiffs with a notice of alleged violations, proposed penalties and opportunity to respond (notice) in November 2004, alleging 17 separate violations of the Campaign Finance Law and Campaign Finance Board Rules. With respect to 8 of the 10 violations that are at issue on this appeal (violations 1-2, 4-8 and 10),* the notice provided the following information: (1) the proposed penalty, (2) the general allegation of a "breach of certification for fraud and misrepresentation" regarding campaign expenditures, (3) the names of the vendors or persons involved in these expenditures, (4) citations to various provisions of the Act and Rules and (5) an exhibit number identifying which of the accompanying documents relate to each specific violation. The remaining two violations alleged fraudulent alterations or omissions in the committee's two written responses to the Board (violation 9), and certain prohibited "coordinated activity" between certain individuals and entities (violation 11). Significantly, however, none of these 10 violations included a specific description of the exact fraudulent conduct that supported each individual charge.

In response to the notice, the committee advised the Board in a letter dated December 29, 2004 that "[w]ithout a clear, precise and unambiguous statement as to the meaning of each finding, we can only guess as to how to respond," and that "[plaintiffs'] due process rights require a more forthcoming and specific set of findings." The Board responded in a January 13, 2005 letter from staff counsel Beth Rotman (supplemental notice), which offered additional clarification on violations 1-8 and 10. The clarification consisted of an allegation that the documents attached as exhibits "bear[ ] significant indicia of fraud and misrepresentation" in that they "do not appear to be contemporaneous, authentic documents generated or signed by the parties presented as generating or signing them." The supplemental notice further identified nine categories of fraud alleged, such as documents created by different persons or entities which contain identical typographical errors, documents from different sources with similar errors or inconsistencies, documents that appear to have been altered, and documents that appear to contain forged signatures. Again, however, the nine categories

---

* The third and twelfth through seventeenth violations are not at issue on this appeal.

of fraud were not linked to any specific violations in the original notice.

Still of the belief that the first 11 violations were not stated with adequate specificity, plaintiffs commenced the instant action against the Board. In their complaint, plaintiffs alleged that the violations in the notice and supplemental notice were "vague, ambiguous and lack specificity," thereby violating plaintiffs' due process rights under the United States and New York constitutions, and their right to notice under the Campaign Finance Law and Campaign Finance Board Rules. Plaintiffs sought temporary and permanent injunctive relief enjoining the Board from taking any action with respect to the alleged violations, including the holding of any hearing before the Board, unless and until the charges were modified to provide sufficient specificity. The Board subsequently cross-moved for an order dismissing the complaint.

In the order appealed from, the motion court denied the cross motion and granted the motion to the extent of staying any hearing or further adjudication of the first, second and fourth through eleventh violations in the notice. In a 28-page opinion, the court held that although the exhaustion doctrine ordinarily precludes resort to the judicial process to review nonfinal determinations of an administrative agency, such doctrine did not apply here because plaintiffs were seeking relief in the nature of mandamus to compel. Thus, the court concluded, plaintiffs' action "turns on whether they have a 'clear legal right' to the sort of notice that they seek and whether the Finance Board has the duty to provide such notice." The court answered both questions in the affirmative, and further concluded that plaintiffs had demonstrated each of the requirements for injunctive relief, including irreparable injury.

On appeal, the Board argues that the motion court erred in finding that the exhaustion doctrine was inapplicable to this case. We agree. It is well settled that one who objects to the acts of an administrative agency must exhaust available administrative remedies before being permitted to litigate in a court of law (*Watergate II Apts. v Buffalo Sewer Auth.*, 46 NY2d 52, 57 [1978]). However, the exhaustion rule is not inflexible and is subject to certain exceptions. The rule need not be followed, for example, when an agency's action is challenged as either unconstitutional or wholly beyond its grant of power, when resort to an administrative remedy would be futile or when its pursuit would cause irreparable injury (*id.*).

In this case, plaintiffs argued and the motion court found that the exhaustion requirement was inapplicable because

plaintiffs were seeking relief in the nature of mandamus to compel, citing *Matter of Hamptons Hosp. & Med. Ctr. v Moore* (52 NY2d 88, 96 [1981]). Unlike the motion court, we do not read the Court of Appeals decision in *Hamptons Hospital* as standing for the proposition that the exhaustion requirement is *never* applicable in proceedings seeking relief in the nature of prohibition or mandamus to compel. On the contrary, the Court of Appeals and this Court have applied the exhaustion requirement to both types of proceedings in circumstances where the petitioner had an adequate remedy at law (*see Matter of Doe v Axelrod*, 71 NY2d 484, 490 [1988] [remedy of prohibition unavailable to overturn Commissioner's reversal of administrative officer's evidentiary ruling because petitioner had adequate remedy in right to appeal final agency determination]; *Matter of DiBlasio v Novello*, 28 AD3d 339, 342 [2006] [absent irreparable injury, exhaustion requirement applicable to petition seeking mandamus to compel a disciplinary agency to comply with hearing officer's order to turn over its file for in camera review]).

Petitioners also contend that by requiring them to answer charges that lacked reasonable specificity, the Board violated their constitutional rights to due process, thus establishing the exception to the exhaustion requirement for unconstitutional agency action. We are not convinced that plaintiffs' procedural due process argument is the type of unconstitutional agency action that is exempted from the exhaustion doctrine. Our review of the cases reveals that this exception is limited to situations where the statute or administrative scheme itself is alleged to be unconstitutional, thus undermining the legality of the entire proceeding (*see e.g. Sohn v Calderon*, 78 NY2d 755, 767 [1991] [challenge to agency action is limited to CPLR article 78 review, except where the applicability or constitutionality of the regulatory statute, or other like questions, are in issue]; *Matter of First Natl. City Bank v City of N.Y. Fin. Admin.*, 36 NY2d 87, 92-93 [1975] [bank challenging constitutionality of tax statute not limited to article 78 proceeding]). In contrast, when the constitutional violation alleged relates to the specificity of notice of charges or the scope of cross-examination in an administrative hearing, the courts have generally precluded judicial relief in the absence of a final agency determination (*see Matter of Rainka v Whalen*, 73 AD2d 731, 732 [1979], *affd for reasons stated at App Div* 51 NY2d 973 [1980] [allegation of constitutionally deficient notice of charges did not justify prohibition relief where adequate remedy existed in review of final determination]; *Doe*, 71 NY2d at 490 [petitioner's claim that denial of cross-examination material was issue of "constitutional dimension" insufficient to avoid exhaustion doctrine]).

The Third Department's decision in *Rainka* (73 AD2d 731 [1979], *supra*) is factually indistinguishable and governs the outcome here. *Rainka* involved a disciplinary proceeding brought by the Department of Health against a respondent dentist for certain unacceptable practices. After an initial investigation and suspension, respondent requested a hearing and was served with notice and supplemental notice of charges. Neither notice particularized the specific instances of misconduct, but rather set forth the general nature of the charges. Petitioner commenced an article 78 proceeding alleging that the notice and hearing procedure violated his constitutional rights. The motion court agreed, and prohibited the hearing unless a bill of particulars was served on respondent.

Noting that prohibition is an extraordinary remedy, the Third Department reversed, holding that even if the Department of Health's action was in excess of its jurisdiction, "prohibition will not lie if there is available an adequate remedy at law which may bar the extraordinary remedy" (*id.* at 732, citing *Matter of State of New York v King*, 36 NY2d 59, 62 [1975]). The *Rainka* court concluded that the respondent had such a remedy in his right to institute an article 78 proceeding after any final determination by the Health Department. Significantly, the Court of Appeals affirmed the Third Department's *Rainka* holding "for reasons stated" by that Court (51 NY2d 973 [1980], *supra*), and it also cited the *Rainka* holding with approval in its subsequent decision in *Doe* (71 NY2d at 490).

Here, as in *Rainka*, plaintiffs are accusing the Board of providing constitutionally deficient notice of charges and are seeking to prohibit any administrative hearing until more specific notice is provided. However, the Court of Appeals soundly rejected that argument in *Rainka* by holding that the administrative process should not be interfered with by a grant of prohibition where the subject of the proceeding has an adequate remedy at law. In this case, as in *Rainka*, we find that plaintiffs have an adequate remedy at law. In the event that the Board sustains any of the charges and/or imposes penalties against them, plaintiffs have the absolute right to seek review of this final determination by way of an article 78 proceeding, wherein they may raise their argument that the notice provided by the Board violated their constitutional right to due process of law.

Nor are we persuaded by the motion court's finding that plaintiffs would suffer irreparable injury in the absence of mandamus and injunctive relief. Plaintiffs argue that in light of Martinez's status as a political figure and candidate for public

office, he faces potentially irreparable harm to his good reputation if he is unable to defend against possibly groundless charges due to inadequate notice. He asserts that this action to compel more specific notice and to enjoin any hearing until such notice is received is the only way to avoid this potential harm. The court found that the possibility of irreparable harm existed, in part, because "the Board will publish [its] negative findings [against Martinez]."

Contrary to the motion court's view, the potential harm to Martinez's reputation is based more on speculation than fact. Administrative Code § 3-708 (6) provides that the Board "shall publicize, as it deems appropriate," the names of those candidates who violate the provisions of the Campaign Finance Act. Thus, the language used in this provision demonstrates that it is within the discretion of the Board to publicize, or not to publicize, its findings. In addition, at this juncture there is no basis to presume that any adverse findings will be made against Martinez, that such adverse findings will have resulted from inadequate notice or that the Board intends to publish such findings prior to completion of article 78 review. Accordingly, we cannot find that plaintiffs have established irreparable injury.

In any event, the type of reputational harm that is alleged by Martinez does not, in this administrative context, qualify as irreparable injury. Every individual who is the subject of a disciplinary or other administrative proceeding necessarily faces the possibility of reputational harm, at least temporarily, if the charges are sustained. However, if administrative proceedings were routinely interrupted and enjoined based on the mere potential of reputational harm that might flow from defects in the administrative proceedings, the administrative process as a whole would be completely undermined. Indeed, if plaintiffs' position were sustained, every proceeding against a candidate for political office, or medical doctor, or other professional could be easily halted based upon the slightest objection to the specificity of notice or amount of cross-examination material received, since such errors in the administrative process might lead to an unfavorable finding and resulting loss of good reputation. Sound and accepted principles of administrative law dictate against such an outcome. Concur—Marlow, J.P., Sullivan, Buckley and Gonzalez, JJ.